Brassard, J.
The plaintiff, Ricardo Cordoba brings this action against the defendant, Jean Ricciardelli, *68 Trustee of the Crystal “A” Really Trust, alleging that the defendant breached a purchase and sale agreement for property located in Danvers, Massachusetts. Specifically, in his Amended Complaint, the plaintiff alleges Specific Performance (Count I), Breach of Contract (Count II), Breach of Implied Covenant of Good Faith and Fair Dealing (Count III), Violation of G.L.c. 93A (Count IV), Declaratory Judgment (CountV), and Estoppel (Count VI).[2] The defendant filed a Counterclaim alleging Breach of Contract (Count I), Breach of Implied Covenant of Good Faith and Fair Dealing (Count II), Deceit and Misrepresentation (Count III), Negligent Misrepresentation (Count IV), Intentional Interference with Advantageous Business or Contractual Relationships (Count V), and Violation of G.L.c. 93A (Count VI). The defendant now moves for sum-maryjudgment on all counts of the plaintiffs Amended Complaint and on all counts of her Counterclaim. The plaintiff moves for summary judgment on all counts of the defendant’s Counterclaim and on Counts I, II and III of his Amended Complaint.[3] For the reasons stated below, the defendant’s motion for summary judgment is ALLOWED on Count I (Specific Performance), Count II (Breach of Contract), and Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) of the plaintiffs Amended Complaint. Furthermore, the plaintiffs motion for summary judgment is ALLOWED on Count I (Breach of Contract) and Count II (Breach of Implied Covenant of Good Faith and Fair Dealing) of the defendant’s Counterclaim.
Background
The undisputed material facts as established by the summary judgment record are as follows. The Crystal “A” Realty Trust (“Trust”) was formed in 1969 and purchased land located in Danvers and Topsfield, Massachusetts. The Trust owns land that comprises 9.8 acres and is generally described as 498R Locus Street, Danvers (“Properly”). The Trust named Jean Ricciardelli (“Ricciardelli”) as its Trustee. Ricciardelli is the decision maker with regard to the Trust and the Property. Ricciardelli, who is 73 years old, and her sister, Theresa Golia, who is 80 years old, are the sole beneficiaries of the Trust.
Early in 1999, the Trust decided to sell the Property.[4] The Trust hired a real estate broker, Ted Kontos, to facilitate the sale. By April 1999, a number of prospective buyers had expressed an interest in purchasing the Property. One of these prospective buyers was the plaintiff, Ricardo Cordoba (“Cordoba”). Initially, the Trust accepted an offer from a bidder other than the plaintiff. When the other bidder failed to complete the purchase of the Property, the Property was again available for sale. At this time, the broker with whom Cordoba was working, Tom Doyle, contacted Cordoba and asked him if he was still interested in buying the Property. The parties entered into negotiations, and the attorney representing Cordoba, Richard Gilmore (“Gilmore”), drafted and sent a proposed purchase and sale agreement to the attorney representing the Trust, James Norris (“Norris”). The parties executed a purchase and sale agreement dated January 27, 2000 (“Agreement”). The Agreement was not signed until February 2, 2000.
The agreed purchase price for the Properly was $410,000.00 for five buildable lots, plus an additional $41,000.00 per lot for each buildable lot in excess of the five lots. The Agreement required Cordoba to use reasonable efforts to seek approval for the maximum number of lots. Under the Agreement Cordoba had six months to obtain all necessary approvals, with all applicable appeal periods successfully expired, for development of the Property as a subdivision, and to obtain access and utility rights from the owners of the adjacent Bridle Spur Road. The Agreement provided for a closing date of July 27, 2000, and provided that “time is of the essence.”[5]
During the six-month period of the Agreement Cordoba negotiated the sale of six of the lots that would be created on the Property, to a third party for $200,000 per lot. He also hired a firm, Hayes Engineering, to develop engineering plans for the Property. On May 5, 2000, Norris, Gilmore, Cordoba, a representative from Hayes Engineering and others met to discuss a potential lot plan for the Property. In June 2000, the parties discussed a preliminary lot preliminary plan. At this time, Norris expressed the Trust’s concern over the fact that the plan had nine lots instead of ten. After this discussion, Cordoba did not discuss any other plans with the Trust until after the six-month period had passed.
Throughout the six months the Agreement was in effect, Cordoba did not apply for any waivers or approvals and did not contact anyone concerning access to and utility rights in Bridle Spur Road. He did not contact the Conservation Commission, and did not approach neighbors or abutters to the Property to gain their support for the proposed development. Cordoba maintains that an application to submit a preliminary plan to the Danvers Planning Board was developed, but the application was never submitted to the Trust or the Danvers Planning Board.
On August 8, 2000, Gilmore’s son contacted Norris and stated that Gilmore would be unavailable and requested that “things wait.” The Trust sent a letter to Cordoba, dated August 10, 2000, stating that the Agreement was void, and returned the refundable portion of his deposit in the form of a check made out for $18,500.00. Cordoba cashed the check several months later. After receiving the August 10, 2000 letter, Cordoba sent the Trust a lot plan showing ten lots and provided financing information. No action was taken on this plan.
The Trust removed the Property from the market for almost one year. In May 2001, the Trust relisted the Property for sale. In response to the relisting, the Trust received a number of offers for the Property. The *69 Property was relisted at $799,000.00, but the Trust received offers in excess of this price, including at least one offer for $900,000.00. Cordoba was notified of the relisting. Cordoba contacted Randy Goldberg and his father Kenneth Goldberg, a real estate attorney with Bernkopf Goodman & Baseman, LLP and a real estate developer. Cordoba assigned his rights in the Agreement to Randy Goldberg’s affiliate, REMF Corporation. Randy Goldberg stated in his deposition that once the land was developed, each lot would have a value of between $200,000.00 to $250,000.00. On or about August 7, 2001, Cordoba filed the complaint in this case asking this court to enforce the Agreement of January 27, 2000. When he filed suit, Cordoba obtained a lis pendens on the Property. The Trust has not yet resold the Property.
Discussion
Summaiyjudgment shall be granted only where there are no genuine issues of material fact in dispute and where the summaiyjudgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). In deciding a motion for summaiyjudgment, the court views the facts “in the light most favorable to .. . [the non-moving party], taking all the facts set forth in its supporting affidavits as true.” G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party demonstrates the absence of a triable issue, the non-moving party may not simply rely on its pleadings but must respond “by affidavits or as otherwise provided in this rule, set[ting] forth specific facts showing that there is a genuine issue for trial.” Correllas v. Viveiros, 410 Mass. 314, 317 (1991), quoting Mass.R.Civ.P. 56(e). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summaiyjudgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991), citing Celotex v. Catrett Corp., 477 U.S. 317, 323 (1986). “Where a moving party properly asserts that there is no genuine issue of material fact, ‘the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented.’ ” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
Breach of Contract (Count II of
Plaintiffs Amended Complaint)
Ricciardelli argues that Cordoba cannot prevail on his claim for breach of contract and that this court should enter judgment in favor of the Trust. Specifically, Ricciardelli argues that the Trust complied with all the terms of the Agreement, and in no way changed the terms of the Agreement or unreasonably withheld approval of any plans. Ricciardelli also claims that the Agreement expired after six months and there was never any extension of the Agreement beyond the six-month period. Cordoba argues that he is entitled to judgment on his claim for breach of contract because Ricciardelli refused to accept fewer than ten lots for the Property, and thus never allowed a final plan to be submitted to the Danvers Planning Board for approval. Cordoba also argues that the Agreement was extended beyond the six months contemplated regardless of his failure to pay carrying costs.
In order to make out a claim for breach of contract the plaintiff must prove (1) the existence of an agreement, (2) supported by valid consideration, (3) performance or its equivalent by the plaintiff and breach by the defendant, and (4) damage to the plaintiff. See Massachusetts Practice, Bishop, Vol. 17, §11; Singarella v. Boston, 342 Mass. 385, 387 (1961). Cordoba has failed to present sufficient evidence to show that Ricciardelli breached the Agreement by unreasonably withholding approval for the Properly plans.
When this court interprets the Agreement it must abide by the premise that “[cjontracts that are free from ambiguity must be interpreted according to their plain terms.” Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass.App.Ct. 726, 729 (1999), citing Freelander v. G.K. Realty Corp., 357 Mass. 512, 516 (1970). This interpretation is generally a question of law for the court. Seaco Ins. Co. v. Barbosa 435 Mass. 772, 779 (2002). This court can discern no ambiguity in the plain language of the Agreement. The plain language of the Agreement does not require Ricciardelli to give approval before Cordoba submits plans to the Danvers Planning Board. It states in relevant part,
The BUYER shall notify SELLER regarding all filings with the Planning Board and Conservation Commission and agrees to confer with SELLER or SELLER’S attorney regarding access to Bridle Spur Road and other major decisions regarding the permitting process.
(Emphasis added.)
The Agreement is clear and unambiguous that the buyer, Cordoba, must confer with the seller, Ricciardelli. By no means does the Agreement state that Ricciardelli has the power to approve filings and applications with the Danvers Planning Board. Rather the only right to pre-approval by Ricciardelli that is mentioned in the Agreement is the right to pre-approve any “waiver requests.”[6] This is distinct from the broader right to pre-approve all applications and filings with the Danvers Planning Board. Therefore, under the plain language of the Agreement, Ricciardelli could not have unreasonably withheld approval which she was not required to give in the first instance.
*70 Even if this court were to find that the Agreement required approval by Ricciardelli, Cordoba’s argument must still fail. The Agreement entered into between Ricciardelli and Cordoba required that Cordoba complete several conditions before the Properly could be transferred. Specifically, Cordoba was required to obtain at least five buildable lots and exercise “reasonable efforts” in seeking approval for the maximum number of lots. He was also required to obtain necessary approvals and waivers from the Danvers Planning Board and the Land Court, and secure access and utility rights in Bridle Spur Road from the “owner(s) thereof.” Cordoba was also required to secure a mortgage on the Property.
The summary judgment record is undisputed that Cordoba never submitted a final application for approval to the Danvers Planning Board or to the Trust. Cordoba admits that he had not applied for any waivers or approvals, or contacted anyone concerning access to and utility rights in Bridle Spur Road. Furthermore, he admits that he never contacted the Conservation Commission and had not approached neighbors or abutters to the Property to gain support for the proposed development. Finally, although an application to submit a preliminaiy plan to the Dan-vers Planning Board was apparently drafted, it was never submitted to anyone.
Cordoba argues that he never met these conditions because of Ricciardelli’s refusal to accept plans for fewer than ten lots. During the negotiations, the Trust raised certain concerns about the proposed preliminary plans for the Property submitted in June 2000, because the number of lots dropped from an expected ten to nine. Even considering these concerns, however, the plans for the Property were not complete because of other issues relating to zoning requirements and utility rights. There is no evidence that any other plans were submitted to the Trust or the Danvers Planning Board after the June 2000 plan had been reviewed and before the Agreement end date passed.
Cordoba next argues that the Agreement was wrongfully terminated by Ricciardelli, and should have been extended beyond the six-month period. Cordoba maintains that the Agreement did not expire after six months because of the contemplated extension upon payment of “carrying costs.” He argues that because Ricciardelli never gave notice of the amount of carrying costs that would be required to extend the Agreement, the Agreement did not end after the original six months had expired. Cordoba has not presented sufficient evidence to show that the Agreement was extended beyond the contemplated six-month end date.
The relevant portion of the Agreement reads, “(m]onthly extensions shall be available upon payment of the property’s carrying costs.” The payment of carrying costs by Cordoba was a condition precedent to any extension of the Agreement. See Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45 (1991) (“[a] condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract”). The condition here was never met — the carrying costs were not paid — and thus the Agreement expired. See id. (“if the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced”).
Cordoba argues, however, that it was impossible for him to know the amount of carrying costs that he had to pay in order to extend the Agreement. The Agreement does not place any affirmative obligation upon Ricciardelli to provide Cordoba with unsolicited information regarding the cariying costs. There is not sufficient evidence in the record demonstrating that an extension was requested or that the specifics of payment of carrying costs were ever discussed prior to the expiration of the six-month Agreement. The only such “evidence” is a statement from Cordoba that says his attorney asked for an extension, something that his attorney does not recall. There is no indication that his attorney inquired into the amount of carrying costs, or that the Trust failed to respond to this request. This is not sufficient to constitute a genuine issue of material fact. Furthermore, there is no evidence that between the time the six-month period ended (August 2, 2000) and the date Cordoba received the Trust’s termination letter dated August 10, 2000, Cordoba made any attempt to pay carrying costs.[7]
Finally, extension of the Agreement is inconsistent with the fact that Cordoba accepted the deposit back from Ricciardelli, and, although he waited several months, he eventually cashed the check. See e.g. Flaherty v. Goldinger, 249 Mass. 564, 567 (1924) (“[w]hen the deposit was returned to the defendant and accepted by him, it is a reasonable inference that the parties waived their rights under the agreement, and intended that it should no longer be of any binding force or effect”). For these reasons, this court finds that summary judgment should enter in favor of Ricciardelli on Cordoba’s breach of contract and specific performance claims.[8]
Breach of Implied Covenant of Good Faith and Fair Dealing (Count III of Plaintiffs Amended Complaint)
Ricciardelli argues that Cordoba has not produced sufficient evidence to maintain a claim for breach of implied covenant of good faith and fair dealing because he has failed to show that the Trust breached any of its express obligations under the Agreement. Furthermore, the Trust argues that Cordoba’s own actions account for his inability to enjoy his right to receive the fruits of the Agreement. Cordoba maintains that Ricciardelli breached the implied covenant of good faith and fair dealing when she failed to approve preliminary plans that contained fewer than ten lots, failed to respond to requests made by him in a timely *71 manner, and failed to give him a reasonable time to pay carrying costs in order to extend the Agreement.
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991), quoting Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). The implied covenant of good faith and fair dealing ensures “that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .” Anthony’s Pier Four, Inc., 411 Mass. at 471, quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976). Cordoba has failed to provide sufficient evidence that the actions of Ricciardelli destroyed his ability to “receive the fruits” of the Agreement. As discussed in the prior section, it was not the action of Ricciardelli that prohibited the Agreement from being completed, but rather the lack of affirmative action on the part of Cordoba: he could have submitted his completed plans to the Danvers Planning Board for approval and he could have paid the carrying costs to extend the Agreement.
Moreover, “the requirement of good-faith performance ultimately is circumscribed by the obligations — the contractual ‘fruits’ — actually contained in the agreement.” AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001). Under all of the circumstances of this case, because there was no breach of the underlying Agreement, there was no breach of the implied covenant of good faith and fair dealing. Ricciardelli is entitled to summary judgment on Cordoba’s claim for breach of implied covenant of good faith and fair dealing.
Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing (Counts I and II of Defendant’s Counterclaim)
Ricciardelli argues that she is entitled to summary judgment on her counterclaim for breach of contract because Cordoba breached the Agreement and the implied covenant of good faith and fair dealing by failing to gain “approval” for his plans for the Properly within six months of signing the Agreement. Cordoba argues no breach occurred because Ricciardelli effectively stopped him from gaining the necessary approvals.
As stated above, “(c)ontracts that are free from ambiguity must be interpreted according to their plain terms.” Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass.App.Ct. at 729, citing Freelander v. G.K. Realty Corp., 357 Mass. at 516. This interpretation is generally a question of law for the court. Seaco Ins. Co. v. Barbosa, 435 Mass. at 779. The Agreement states in relevant part,
This Agreement is contingent upon BUYER obtaining at least 5 buildable lots. The purchase price for the 5 lots shall be $410,000.00. The BUYER shall be bound to exercise reasonable efforts in seeking approval for the maximum number of lots, and the purchase price would increase by $41,000.00 per lot should more than 5 lots be approved. “Reasonable efforts” include no subdivision regulations waivers other than waivers which must be granted for any five (5) lot subdivision on the premises. SELLER shall have the right to pre-approve any waiver requests, which approval shall not be unreasonably withheld. “Approval” means all necessary governmental action, including but not limited to the Danvers Planning Board and the Massachusetts Land Court, as well as access and utility rights in Bridle Spur Road from the owner(s) thereof. The BUYER shall have 6 months from the signing of this Agreement to obtain such approval, with all applicable appeal periods having successfully expired, otherwise this Agreement is void with the refundable portion of the deposit returned.
Under the express terms of the Agreement, Cordoba has an affirmative obligation to use “reasonable efforts” to gain approval for the plans for the Property. The Supreme Judicial Court addressed the issue of “reasonable efforts” on the part of a buyer of real estate in Sechrest v. Safiol 383 Mass. 568, 571-72 (1981).[9] In Sechrest, the Court found that the buyer did not use reasonable efforts in seeking approval from a Town. In describing the buyer’s efforts the Court stated,
[The buyer] never submitted any building plans or any application for a building permit to the town of Wellesley; nor did he seek any other town approval necessary for the construction of a single-family dwelling. He did have an architect prepare preliminary drawings, which he submitted for a price estimate to the builder he had chosen... [he] never completed the final plans.
Id. at 569.
Similar to the buyer in Sechrest, Cordoba never submitted any Property plans or applications to the Danvers Planning Board. Nor did Cordoba obtain necessary approvals from the Massachusetts Land Court, or secure access and utility rights in Bridle Spur Road. Based on these efforts, this court finds that Cordoba breached the Agreement by failing to use “reasonable efforts” in obtaining the necessary approvals of the respective governmental agencies. Sechrest, 383 Mass. at 569, 572. As to Cordoba’s claim that Ricciardelli effectively prohibited Cordoba from obtaining the necessary approvals, this court has already considered that argument and has found it unpersuasive.
However, in his August 10, 2000 letter to Cordoba, Ted Kontos, on behalf of the Trust, stated,
The January 27, 2000 agreement between the parties regarding the above properly was contingent upon Mr. Cordoba’s obtaining approval for the maximum number of lots, but at least five, at the Seller’s *72 site by this time. As Mr. Cordoba has not obtained such approval, that agreement is void. The $18,450 refundable portion of Mr. Cordoba’s deposit is therefore returned herewith, at the instruction of the Seller.
The only reasonable way to read the Agreement is that the buyer was required to use reasonable efforts to gain approvals for the Property, and if unsuccessful within the six-month period provided by the Agreement, the seller would return the deposit and the Agreement would end. The defendant cannot have it both ways by now seeking a remedy for the plaintiffs breach of contract. The court recognizes that the plaintiff failed to use reasonable efforts as required under the Agreement, but the defendant handled that breach through the August 10, 2000 letter in which it ended the Agreement and returned the deposit. See e.g. Flaherty v. Goldinger, 249 Mass. at 567 (“[w]hen the deposit was returned to the defendant and accepted by him, it is a reasonable inference that the parties waived their rights under the agreement, and intended that it should no longer be of any binding force or effect”). Therefore, the plaintiff is entitled to summaiy judgment on the defendant’s counterclaims of breach of contract and the implied covenant of good faith and fair dealing.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for summary judgment is ALLOWED on Count I (Specific Performance), Count II (Breach of Contract), and Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) of the plaintiffs Amended Complaint. It is further ORDERED that the plaintiffs motion for summaiy judgment is ALLOWED on Count I (Breach of Contract) and Count II (Breach of Implied Covenant of Good Faith and Fair Dealing) of the defendant’s Counterclaim. The court takes no action on the remaining claims of the parties.

 This court allowed Cordoba to file a Supplemental Complaint which included a claim for Breach of Settlement Agreement (Count VII). The parties do not address Count VII in their motions for summaiy judgment.

 At oral argument, this court informed the parties that it would only consider the following counts at this time: Specific Performance (Count I), Breach of Contract (Count II), and Breach of Implied Covenant of Good Faith and Fair Dealing (Count III) of the plaintiffs Amended Complaint, and Breach of Contract (Count I) and Breach of Implied Covenant of Good Faith and Fair Dealing (Count II) of the defendant’s Counterclaim.

 Ricciardelli is the defendant in this case, but as she is the Trustee, this court will often frame the issue in terms of the Trust’s actions as well.

 The Agreement was not signed until February 2, 2000, therefore the plaintiff maintains that the Agreement did not expire until six months after February 2, 2000, and not on July 27, 2000. Any discrepancy in the closing date is not material.

 The Agreement states in relevant part,
The BUYER shall be bound to exercise reasonable efforts in seeking approval for the maximum number of lots, and the purchase price would increase by $41,000.00 per lot should more than 5 lots be approved. “Reasonable efforts” include no subdivision regulations waivers other than waivers which must be granted for any five (5) lot subdivision on the premises. SELLER shall have the right to pre-approve any waiver requests, which approval shall not be unreasonably withheld.

 Even if Cordoba was entitled to a reasonable time to make the payment of carrying costs, as Cordoba argues, there is no evidence in the summary judgment record that indicates Cordoba ever planned on paying the carrying costs at anytime. Aside from the fact that he did not attempt to pay during the week after the Agreement ended, his attorney was unavailable for some time during the month after the six-month period ended.

 Because this court enters judgment in favor of the Ricciardelli on Cordoba’s breach of contract and breach of implied covenant of good faith and fair dealing claims, there is no need to address Cordoba’s claim for specific performance. Cordoba is not entitled to any relief for breach of the Agreement.

 The Court in Sechrest was addressing a provision in the purchase and sale agreement that gave the buyer the power to terminate the agreement in the event he was unable to obtain approval from the town. 383 Mass. at 571. Although the provision in the Agreement is somewhat different, it nonetheless places an affirmative obligation upon Cordoba to obtain approval.